IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 07-640-1 |
| | : | |
| RAKAHN BURTON | : | |

### MEMORANDUM AND ORDER

**Juan R. Sánchez, J.,**                                                      **October 27, 2008**

Defendant Rakahn Burton asks this Court to suppress all physical evidence relating to the search warrant executed on December 9, 2005, at 7545 Battersby Street, Philadelphia, Pennsylvania, all physical evidence relating to the search warrant executed on September 19, 2007, at 7209 Kindred Street, Philadelphia, Pennsylvania, and all evidence relating to and seized from his person and the Oldsmobile vehicle after his September 19, 2007 arrest.  The Government argues the evidence is admissible because the affidavits supporting the search warrants established sufficient probable cause and Burton's arrest and subsequent search of the Oldsmobile were lawful.  I agree.

Burton also asks me to sever the offenses relating to the drug conspiracy with co-defendant Tyree Barnwell from the offenses involving his conduct on December 9, 2005, which are unrelated to Barnwell.  The Government asserts both sets of charges are interrelated, involving Burton's plan to earn money by distributing crack on Philadelphia's streets, and Burton has failed to demonstrate any resulting prejudice from a joint trial addressing all of the charged offenses.  I also agree with the Government's position the offenses should not be severed.

**FINDINGS OF FACT**

1.       On November 28, 2005, at 8:30 p.m., acting on numerous anonymous complaints of drug

1

sales, Officer Stephen Dmytryk, set up a surveillance of 7545 Battersby Street.

2.     At 8:45 p.m., Officer Dmytryk observed a blue Buick arrive at 7545 Battersby Street and a man with a black bag in his hand, later identified as Burton, leave 7545 Battersby Street and walk to the Buick. Burton handed the bag to the Buick's driver. The Buick then left the area, and Burton went back into 7545 Battersby Street.

3.     At 9:05 p.m., Officer Dmytryk observed a dark-colored Buick with a Pennsylvania tag park outside 7545 Battersby Street. Officer Dmytryk then saw Burton again exit 7545 Battersby Street with a black bag in his hand and walk to the Buick. Burton handed the bag to the driver, the Buick left the area, and Burton went back into 7545 Battersby Street.

4.     At 9:30 p.m., Officer Dmytryk observed Burton leave 7545 Battersby Street, enter a light blue BMW parked in the rear of 7545 Battersby Street, and leave the area.

5.     On November 30, 2005, at 7:30 p.m., Officer Dmytryk again set up a surveillance of 7545 Battersby Street. At 8:00 p.m., Officer Dmytryk observed the light blue BMW park at 7545 Battersby Street, and saw Burton leave the BMW and enter 7545 Battersby Street using a key.

6.     At 9:00 p.m., Officer Dmytryk observed the same dark-colored Buick he had observed two days prior park outside 7545 Battersby Street. A second man left the Buick and entered 7545 Battersby Street. Approximately 20 minutes later, the second man left 7545 Battersby Street with a black bag in his hand, walked to a silver-colored vehicle, handed the bag to the passenger of the vehicle, and went back into 7545 Battersby Street.

7.     At 11:55 p.m., Officer Myers observed the light blue BMW park in the rear of 7545 Battersby Street. Burton left 7545 Battersby Street with a black bag in his hand and entered

2

the light blue BMW.  Burton was then followed by Officer Myers, who observed Burton meeting with a woman.  The woman entered the BMW for approximately one minute, exited, then entered a dark-colored Ford.

8.    On December 6, 2005, at 9:00 p.m., Officer Dmytryk drove past 7545 Battersby Street and saw the light blue BMW parked in the rear of 7545 Battersby Street.  Officer Hannan then set up a surveillance of the rear of the property.

9.    Approximately 30 minutes later, Burton left 7545 Battersby Street and entered the BMW carrying a large plastic sneaker bag.  Burton was stopped for investigation and he provided a fictitious address of 1802 Faunce Street.  He was cleared pending further investigation.

10.   On December 9, 2005 at 3:00 p.m., Officer Dmytryk and Officer Trappler searched the trash at 7545 Battersby Street and recovered a large plastic sneaker bag containing one empty box for a Tanita digital scale, one clear plastic bag containing numerous green-tinted plastic packets, two clear plastic bags containing numerous yellow-tinted packets, one letter from ADT security addressed to Rakahn Burton at 7545 Battersby St., Philadelphia, PA 19152, postmarked November 8, 2005, and one letter from Verizon addressed to Rakahn Burton at 7545 Battersby St., Philadelphia, PA 19152, dated October 31, 2005.

11.   Officer Dmytryk, the affiant, had been a police officer for ten years with six years of service in the Narcotics Bureau.  He had prepared numerous search and seizure warrants, conducted hundreds of narcotic investigations, and participated in over 100 undercover narcotics purchases.

12.   During May 2007, a Drug Enforcement Administration (DEA) confidential source deemed reliable in the past identified Burton as a large scale crack cocaine distributor operating in

the Philadelphia and Chester County areas.  The confidential source also identified Burton's co-defendant Tyree Barnwell, Clinton Cooper, and other individuals as assisting Burton in his narcotics organization.  The confidential source stated Barnwell distributed crack cocaine and Cooper laundered money and straw purchase assets for Burton.  The confidential source also stated Burton utilized a girlfriend's residence in Philadelphia to store narcotics.  The confidential source stated Burton drove a BMW registered to Clinton Cooper at 1908 Berkshire Street in Philadelphia, the residence of Burton's mother.

13.     Beginning in May 2007, DEA agents arranged four purchases of crack cocaine by undercover officer John Coyne from Barnwell on June 21, July 5, July 26, and August 29, 2007.

14.     On June 21, 2007, at 4:42 p.m., Officer Coyne, working undercover, provided with funds and a recording device,  called Barnwell's cellular phone and they agreed to meet in the Lowe's parking lot located on Delaware Avenue in Philadelphia.  At 5:19 p.m., they met as agreed and Officer Coyne requested an ounce of crack cocaine.  Barnwell stated he had to get the crack cocaine.  Surveillance unsuccessfully followed Barnwell.  Barnwell telephoned Officer Coyne at 6:44 p.m. and said to meet at the Home Depot parking lot located at 24th Street and Oregon Avenue in Philadelphia.  Barnwell explained he was waiting for his source of supply at the Sheraton Hotel in King of Prussia, Pennsylvania.  At 7:29 p.m., Barnwell met with Officer Coyne in the Home Depot parking lot and sold Officer Coyne one ounce of crack cocaine, containing 27.8 net grams of crack cocaine, for $900.00.

15.     Barnwell stated later that after he met with Officer Coyne, he traveled to King of Prussia, Pennsylvania, met with Burton, who was driving a white Oldsmobile, and obtained one ounce of crack cocaine from Burton.  After Barnwell sold Officer Coyne the crack cocaine,

4

Barnwell met with Burton, paid Burton, and Barnwell received $50.00 for conducting the transaction.

16.   On July 5, 2007, at 6:10 p.m., Officer Coyne, again provided with funds and a recording device, placed a recorded telephone call to Barnwell.  Barnwell stated he would be able to meet Officer Coyne in the Home Depot parking lot at Castor Avenue in Philadelphia, and surveillance observed Barnwell depart his residence at 153 Palmer Street in a white Oldsmobile.  Surveillance was subsequently lost on the white Oldsmobile.  At 7:51 p.m., surveillance observed Barnwell and Burton arrive at the Home Depot parking lot in a grey Pontiac.  Barnwell met with Officer Coyne in Officer Coyne's vehicle, where Barnwell sold Officer Coyne two ounces of crack cocaine, containing 55.3 net grams of crack cocaine, for $1,800.00.  In a recorded conversation during the purchase, Barnwell stated the man in the grey Pontiac was his cousin, the Pontiac was a rental, and his cousin had a BMW.  Barnwell indicated Burton knew what Barnwell was doing and stated he and Burton were partners.  When Officer Coyne asked whether Barnwell could supply Officer Coyne with half of a kilogram of crack cocaine, Barnwell responded he could.

17.   Barnwell stated later that he had met Burton at 7209 Kindred Street, where Barnwell entered the grey Pontiac Burton had been using, traveled to the Home Depot parking lot, Barnwell received the crack cocaine from Burton, and sold it to Officer Coyne.  Barnwell received $100 from Burton for conducting the transaction.

18.   On July 26, 2007, Barnwell met with Officer Coyne in the Palmer Street Home Depot parking lot, where Barnwell sold Officer Coyne 4.5 ounces of crack cocaine, containing 124.1 net grams of crack cocaine, for $3,900.00.

19.     Barnwell stated later that he had met Burton at 7209 Kindred Street, obtained the 4.5 ounces
        of crack cocaine from Burton, and later sold it to Officer Coyne.  Barnwell then met with
        Burton and gave Burton $3,800.00.  Barnwell received $100 for conducting the transaction.

20.     On August 29, 2007, Barnwell met with Officer Coyne and both entered Barnwell's white
        Oldsmobile, where Barnwell showed Officer Coyne the half of a kilogram of crack cocaine,
        containing 506 grams of crack cocaine.  After the two exited the Oldsmobile so Officer
        Coyne could obtain funds from his vehicle,  Barnwell was arrested.  After the arrest,
        Barnwell made a recorded phone call to Burton.  Barnwell said he was still waiting for the
        buyer to arrive and asked whether he should bring the drugs back or continue to wait.  Burton
        instructed Barnwell to wait for the buyer and not bring back the drugs.

21.     Barnwell later told the agents he had picked up the crack cocaine from Burton at 7209
        Kindred Street.

22.     Burton was present during the second purchase on July 5, 2007.  All of the purchases and
        accompanying conversations were recorded by audio or audio and video.  Barnwell was
        arrested shortly after the August 29, 2007 undercover purchase.  Barnwell identified Burton
        as his first cousin and as his supplier of crack cocaine for all four undercover purchases.
        Barnwell linked Burton to 7209 Kindred Street and stated he met Burton at this location to
        get the narcotics for three of the four undercover purchases.

23.     Barnwell further stated he had been selling crack cocaine for Burton since Easter of 2007,
        and Barnwell had been to 7209 Kindred Street approximately 20 or 30 times and picked up
        cocaine from Burton there approximately nine times.  Barnwell stated he had observed

6

Burton cooking crack cocaine inside 7209 Kindred Street on several occasions.  Barnwell stated he had observed Burton retrieve cocaine from the kitchen cabinet, place the cocaine in a pink glass pot, mix it with baking soda and water, and later dry the crack cocaine with a paper towel.

24.   Barnwell identified a photograph of an Ashley Griffin, stating Griffin lived at 7209 Kindred Street with her child.  Barnwell stated Burton sometimes stayed with Griffin and Burton had a key to the residence.  On September 12, 2007, at 7:02 a.m., surveillance corroborated Barnwell's statements by observing Griffin exiting 7209 Kindred Street with a small child.

25.   On September 12, 2007, an arrest warrant for Burton was issued pursuant to an affidavit of probable cause based on Burton's activities at, and the items seized from, 7545 Battersby Street.  The facts set forth in the affidavit supporting the arrest warrant included items seized from 7545 Battersby Street on December 9, 2005:  a Sam's Club picture ID for Rakahn Burton, letters from ADT and PECO dated December 2, 2005 and addressed to Rakahn Burton at 7545 Battersby Street, one clear bag containing unused green-tinted packets, one bundle containing 50 pink-tinted packets of crack cocaine, one bundle containing 50 purple-tinted packets of crack cocaine, one bundle containing 51 purple-tinted packets of crack cocaine, four clear small bags containing white residue, one digital scale with white residue, four clear small bags containing bulk amounts of crack cocaine, and $104.00 in United States currency.

**DISCUSSION**

Burton seeks to suppress all evidence seized from 7545 Battersby Street pursuant to the

search warrant executed on December 9, 2005, and all evidence seized from 7209 Kindred Street pursuant to the search warrant executed on September 19, 2007.  The Government contends both warrants and affidavits were supported by probable cause.  The evidence seized from both locations is admissible.

The Fourth Amendment provides "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing . . . the persons or things to be seized." U.S. Const. amend. IV.  The probable cause requirement applies both to arrest and search warrants. *Wong Sun v. United States*, 371 U.S. 471, 482 n.9 (1963).  The Fourth Amendment allows "the usual inferences which reasonable men draw from evidence . . . . Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."  *Johnson v. United States*, 333 U.S. 10, 13-14 (1948).

The magistrate must "make a practical commonsense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238.  "Sufficient information must be presented to the magistrate . . . to determine probable cause; [her] action cannot be a mere ratification of the bare conclusions of others. . . . [T]o ensure that such an abdication of the magistrate's duty does not occur, courts must continue to conscientiously review the sufficiency of affidavits." *Illinois v. Gates*, 462 U.S. 213, 239 (1983).

A reviewing court must determine only that the magistrate judge had a "substantial basis" for concluding probable cause existed to uphold the warrant. *Gates*, 462 U.S. at 238.  A court

determines whether "the affidavit provides a sufficient basis for the decision the magistrate judge actually made." *United States v. Jones*, 994 F.2d 1051, 1057 (3d Cir. 1993).  In this role, a reviewing court may consider only evidence within the four corners of the warrant application to ensure the magistrate had a substantial basis for concluding probable cause existed.  *Jones*,  994 F.2d at 1055 (citations omitted).  In addition, "[t]he supporting affidavit must be read in its entirety and in a commonsense and nontechnical manner." *United States v. Conley*,  4 F.3d 1200, 1206 (3d Cir. 1993) (citing *Gates*, 462 U.S. at 230-31).

In *Gates*, the Supreme Court stated "probable cause is a fluid concept – turning on the assessment of probabilities in particular factual context – not readily, or even usefully, reduced to a neat set of legal rules." *Id.*  at 232.  Probable cause "requires more than mere suspicion; however, it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." *United States v. Burton*, 288 F.3d 91, 98 (3d Cir. 2002) (citing *Orsatti v. N.J. State Police*, 71 F.3d 480, 482-83 (3d Cir. 1995)).  The facts and observations must be analyzed "through the lens of the [officer's] significant experience with similar transactions."  *Id.* at 99 (citing *Ornelas v. United States*, 517 U.S. 690, 696 (1996); *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

Here, when Officer Dmytryk sought a search warrant for 7545 Battersby Street, he had been a police officer for 10 years and assigned to the Narcotics Bureau for six years.  He had conducted hundreds of narcotics investigations in his career and had participated in over 100 undercover narcotics purchases.   Because of his experience with narcotics investigations and personal knowledge of narcotics transactions, Officer Dmytryk was able to identify criminal activity involving narcotics.  *See Burton*, 288 F.3d at 99.

Twice during the night of November 18, 2005, Officer Dmytryk observed a vehicle park outside 7545 Battersby Street.  Each time, Officer Dmytryk saw Burton leave the house with a black bag and hand the bag into the car to the driver, the vehicle then left, and Burton returned to the house.  On the night of November 30, 2007, Officer Dmytryk saw Burton arrive at 7545 Battersby Street and enter the house using a key.   Officer Dmytryk later saw one of the vehicles he had observed on November 18, 2005, park again at 7545 Battersby Street, and the driver got out and entered the house. Twenty minutes later, the driver emerged with a black bag in his hand, walked to a waiting vehicle, handed the bag to the passenger, and returned to the house.  Later that same night, Officer Dmytryk observed Burton leave with a black bag in his hand, drive away in a BMW parked at the house, and meet a woman who entered the BMW briefly.  On December 6, 2005, Burton, carrying a large plastic sneaker bag, was observed leaving 7545 Battersby Street and entering the BMW.  When stopped for investigation, Burton provided a fictitious address.  On December 9, 2005, Officers Dmytryk and Trappler searched the trash at 7545 Battersby Street and found a large plastic sneaker bag containing various items consistent with the packaging and distribution of narcotics and letters from businesses addressed to Rakahn Burton at 7545 Battersby Street, linking him to the property and the packaging of narcotics.

The police officers' independent surveillance of the activities at 7545 Battersby Street and the police officers' own discovery of the narcotics trade-related trash at the property substantiated the anonymous complaints.  *See United States v. Singleton*, 439 F.2d 381, 384 (3d Cir. 1971) (noting where an  informant's tip is verified by independent personal observations by police, probable cause may be established) (citing *Draper v. United States*, 358 U.S. 307 (1959); *Kislin v. New Jersey*, 429

F.2d 950 (3d Cir. 1971).  Given the police officers' independent observations of the activities at 7545 Battersby Street, Burton's activities, Burton's supplying of a fictitious address, the police officers' discovery of paraphernalia related to narcotics distribution in trash at the property, and Officer Dmytryk's experience with narcotics investigations and narcotics transactions, it was reasonable for Officer Dmytryk to believe 7545 Battersby Street was being used to package, store, and sell illegal narcotics.

Moreover, "direct evidence linking the residence to criminal activity is not required to establish probable cause." *Burton*, 288 F.3d at 103 (citations omitted).  "While ideally every affidavit would contain direct evidence linking the place to be searched to the crime, it is well established that direct evidence is not required for the issuance of a search warrant." *Id.* (citing *Jones,* 994 F.2d 1051, 1056 (3d Cir. 1993)).  "Instead, probable cause to search can be based on an accumulation of circumstantial evidence that together indicates a fair probability of the presence of contraband." *Id.*  The issuing authority had a substantial basis for concluding probable cause existed to support the warrant. *See Gates*, 462 U.S. at 238.   The evidence seized as a result of the search warrant executed on December 9, 2005, at 7545 Battersby Street, is therefore admissible.

Regarding the seizure of evidence from 7209 Kindred Street on September 19, 2007, when Agent Wood prepared the affidavit in support of the search warrant, he had been a Special Agent with the DEA since 1999 and had participated in the investigation and prosecution of numerous narcotics traffickers.  Based on his training and experience, Agent Wood knew what kinds of activities and tangible items were consistent with drug trafficking and drug trafficking conspiracies.[1]

---

[1]For example, Agent Wood knew drug traffickers commonly provide drugs on consignment to their clients; it is common for drug traffickers to secrete contraband, proceeds of drug sales, and records

On the information of a confidential source who identified Burton and Barnwell as involved in the distribution of crack cocaine,[2] DEA agents arranged undercover purchases of crack cocaine. Over the course of the undercover transactions, Barnwell delivered increasingly larger quantities of crack cocaine, from one ounce to half of a kilogram. Barnwell stated he had obtained the crack cocaine for each transaction from Burton. Barnwell later stated he met Burton at 7209 Kindred Street prior to three of the transactions. Barnwell also stated he paid Burton money for the crack cocaine following the first three transactions, and was supposed to have paid Burton $14,000.00 following the final transaction. After Barnwell was arrested, he made a recorded telephone call to Burton for instructions regarding the crack cocaine Barnwell was to sell, and Burton provided instructions to Barnwell regarding the sale. Barnwell finally stated he had picked up cocaine from Burton at 7209 Kindred Street approximately nine times, and had observed Burton storing and

---

of drug transactions in secure locations such as their residences; persons involved in drug trafficking often conceal caches of drugs, large amounts of currency, and other items or proceeds from drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money acquired from engaging in narcotics trafficking activities; drug traffickers commonly maintain addresses or telephone numbers in books or papers which reflect information regarding their associates in the drug trafficking organization; drug traffickers sometimes take or cause to be taken photographs of themselves, their associates, their property and their products, and these photographs are usually maintained at the traffickers' residences; drug traffickers often utilize electronic equipment such as computers, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record, and/or store information; drug traffickers often place assets in names other than their own to avoid detection by law enforcement agencies; and drug traffickers often continue to use and exercise dominion and control over assets placed in others' names.

[2]The confidential source's information was later corroborated by Barnwell's statements that Burton was his supplier of crack cocaine, he and Burton were partners, he received money from Burton for selling crack cocaine, Burton drove a BMW, Burton sometimes stayed with Ashlee Griffin at her house at 7209 Kindred Street, Burton stored crack cocaine in the kitchen cabinet at 7209 Kindred Street, Burton cooked cocaine inside 7209 Kindred Street, and Clinton Cooper was the boyfriend of Burton's mother.

cooking crack cocaine inside 7209 Kindred Street on several occasions.

In drug-related cases, numerous courts of appeals have held evidence of drug crimes is likely to be found in drug dealers' residences. *See Whitner*, 219 F.3d at 298 (citing cases in accord from the United States Courts of Appeals for the First, Second, Fourth, Sixth, Seventh, Eighth, Ninth, and District of Columbia Circuits). The Third Circuit reasoned "evidence associated with drug dealing needs to be stored somewhere, and . . . a dealer will have the opportunity to conceal it in his home." *Id.* at 297. In *Whitner*, the defendant was evasive about where he lived, leading to a "reasonable inference [he] was attempting to conceal the existence of the apartment and his association with the apartment. This attempt at concealment when combined with the other information . . . set forth in [the] affidavit logically suggests [the defendant] was storing some evidence of illegal activity at the apartment." *Id.* at 299.

Probable cause "can be, and often is, inferred by considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide stolen property." *Burton*, 288 F.3d at 103 (citations omitted). The affidavit in *Burton* stated "[p]ersons involved in large-scale drug trafficking and those who assist them frequently conceal in locations known as 'stash-houses' caches of drugs, drug paraphernalia, firearms, large amounts of currency, and other evidence of drug dealing." *Id.* at 105. In *Hodge*, "[t]he amount of crack cocaine Hodge possessed indicated that he was involved in selling drugs, rather than merely using them." *Hodge*, 246 F.3d at 306. The Court found "an experienced and repeat drug dealer who would need to store evidence of his illicit activities somewhere. . . . It is reasonable to infer that a person involved in drug dealing on such a scale would store evidence of

that dealing at his home." *Id.*

From the facts procured from the confidential source, Barnwell's statements, and the nature of the undercover transactions, and analyzed "through the lens of the [officer's] significant experience with similar transactions," *Burton*, 288 F.3d at 99, it was reasonable for Agent Wood to believe 7209 Kindred Street would contain evidence of distribution of controlled substances and conspiracy to distribute controlled substances. I conclude the magistrate judge had a "substantial basis" for determining sufficient probable cause existed for issuing the warrant. *See Gates*, 462 U.S. at 238. The evidence seized as a result of the search warrant executed on September 19, 2007, at 7209 Kindred Street is therefore admissible.

Burton next argues evidence recovered relating to his arrest must be suppressed because law enforcement officers had no probable cause to arrest him or to search his vehicle, an Oldsmobile. The Government asserts the arrest warrant is supported by probable cause and the warrantless search of the Oldsmobile was proper. I conclude the evidence yielded from Burton's arrest and the search of the Oldsmobile are admissible.

The same probable cause requirement for search warrants applies to arrest warrants. *Wong Sun*, 371 U.S. at 482. Here, the arrest warrant was based on the facts of the search warrant for 7545 Battersby Street, which I have found was supported by sufficient probable cause, and the results of that December 9, 2005 search. In addition to the events leading up to the search of 7545 Battersby Street – the officers' independent observations, their discovery of materials consistent with the packaging of narcotics, the discovery of mail linking Burton to the property, and Burton's answering with a fictitious address when stopped by the officers – the search itself yielded additional materials

14

related to narcotics distribution.  The search uncovered over 150 packets of crack cocaine, four small bags containing bulk amounts of crack, and more mail and an ID card linking Burton to the property. Agent Wood, who prepared the affidavit of probable cause for the arrest warrant, had been a DEA Special Agent since 1999.  He had specialized training in the investigation and identification of narcotics traffickers and experience in the investigation and prosecution of numerous narcotics traffickers.  Based on his training, experience, and the facts set forth in the affidavit, Agent Wood had probable cause to believe Burton possessed with intent to distribute approximately 319 grams of crack cocaine on December 9, 2005.

Considering the amount of narcotics and related materials found at 7545 Battersby Street, *see Hodge*, 246 F.3d at 306 (concluding "[t]he amount of crack cocaine Hodge possessed indicated that he was involved in selling drugs, rather than merely using them"), combined with the officers' independent surveillance of Burton's activities at the property and the officers' discovery of personal mail identifying Burton with the property, there was sufficient probable cause set forth in the affidavit to support the issuance of an arrest warrant.  *See Gates*, 462 U.S. at 238.

I also conclude the warrantless search of Burton's vehicle was lawful.  After Burton was arrested, he voluntarily surrendered to police officers the keys to a BMW and an Oldsmobile.  A subsequent search of the Oldsmobile yielded two packets of crack cocaine found on the floor of the Oldsmobile.  A warrantless search of a vehicle even though the vehicle is in police custody is justified when the police officers have probable cause to believe there is contraband in the vehicle. *Chambers v. Maroney*, 399 U.S. 42, 46-52 (1970).  Here, officers had probable cause to believe narcotics were in the vehicle because the Oldsmobile had been linked to narcotics distribution in the

affidavit of probable executed on September 19, 2007.  Specifically, on July 5, 2007, Barnwell drove

the Oldsmobile to deliver two ounces of crack cocaine to the undercover officer, and on August 29,

2007, Barnwell again drove the Oldsmobile to deliver half of a kilogram of crack cocaine to the

undercover officer.  During the August 29, 2007 meeting with the undercover officer, Barnwell and

the undercover officer entered the backseat of the Oldsmobile where Barnwell showed the

undercover officer the crack cocaine.  Based on this information, the officers had sufficient probable

cause to believe narcotics would be in the Oldsmobile, and their search of the vehicle was justified.

        Burton finally asks me to sever the offenses pertaining to criminal activity occurring in

2007, and involving co-defendant Barnwell, from the offenses pertaining to criminal activity

occurring in 2005.  Federal Rule of Criminal Procedure 8(a) permits joinder of offenses when the

offenses charged "are of the same or similar character, or are based on the same act or

transaction, or are connected with or constitute parts of a common scheme or plan."

        Burton's Superseding Indictment contains two sets of offenses.  Counts One through Five

charge Burton and Barnwell with conspiracy to possess with intent to distribute crack cocaine

and possession with intent to distribute crack cocaine, and pertain to criminal acts occurring

between March 2007 and August 29, 2007.  Counts Six and Seven charge Burton only with

possession with the intent to deliver crack cocaine, stemming from an investigation on December

9, 2005.  Both sets of charges involve the distribution of crack cocaine in Philadelphia and will

involve similar evidence regarding the paraphernalia used in the packaging and distribution of

crack cocaine, the amounts of crack cocaine involved (suggesting it was not for personal use but

for distribution purposes), the street value of crack cocaine, and the process of making crack

cocaine.  The offenses are thus all of a similar character and constitute parts of a common scheme or plan of Burton's to profit from the distribution of crack cocaine in Philadelphia. Moreover, Burton has failed to show prejudice under Federal Rule of Criminal Procedure 14(a), which gives me the discretion to order separate trials of counts if it appears the defendant may suffer prejudice from joinder.  Burton's motion to sever counts is denied.

**CONCLUSIONS OF LAW**

1.      The December 2005 affidavit established a substantial basis for concluding probable cause existed to uphold the search warrant for 7545 Battersby Street; the resulting evidence from the warrant executed on December 9, 2005 is therefore admitted.

2.      The September 2007 affidavit established a substantial basis for concluding probable cause existed to uphold the search warrant for 7209 Kindred Street; the resulting evidence from the warrant executed on September 19, 2007 is therefore admitted.

3.      Burton's September 19, 2007 arrest was lawful and the subsequent search of the Oldsmobile was justified because police officers had probable cause to believe narcotics would be found in the Oldsmobile; therefore, the evidence seized from Burton's person and the Oldsmobile after his arrest is admitted.

4.      Burton's seven offenses are properly joined.

        An appropriate order follows.